UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RALPH M. YACKLEY,

                                    CASE NO. 16-cv-14075
          *Plaintiff*,                  MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*
_____/


## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 14, 17)

I.     **OPINION**

       **A. Introduction and Procedural History**

       This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Ralph Yackley's claim for disability benefits under the

Disability Insurance Benefits program of Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). The

case is before the undersigned magistrate judge pursuant to the parties' consent under 28

U.S.C. § 636(c), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference. (Docs. 4, 13). The

matter is currently before the Court on cross-motions for summary judgment. (Docs. 14,

17).

       Yackley was 58 years old when his insured status expired in December 2012. (Tr.

146). On April 2, 2014, he filed his initial application for Disability Insurance Benefits.

(Tr. 131-32). After the Commissioner denied his claim, Yackley requested a hearing, (Tr.

80), which was held before Administrative Law Judge Amy L. Rosenberg, (Tr. 28), and

1

included testimony from both Yackley, (Tr. 33), and Vocational Expert Amelia Shelton, (Tr. 50). Yackley also took the opportunity to amend his alleged onset date from January 15, 2008, to August 28, 2012. (Tr. 16, 196). Ultimately, the ALJ found that Yackley had not had a disability during the relevant time period. (Tr. 24), and the Appeals Council denied Yackley's request for review. (Tr. 1, 16-24). This action followed.

**B. Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you

can still do your past relevant work, we will find that you are
not disabled. . . .

(v) At the fifth and last step, we consider our assessment of
your residual functional capacity and your age, education, and
work experience to see if you can make an adjustment to other
work. If you can make an adjustment to other work, we will
find that you are not disabled. If you cannot make an
adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

[he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r

of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically

determinable physical or mental impairment (expected to last at least twelve months or

result in death) that rendered him unable to engage in substantial gainful activity. 42 U.S.C.

§ 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth

step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459

F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that

"other jobs in significant numbers exist in the national economy that [the claimant] could

perform given [his or] her RFC [residual functional capacity] and considering relevant

vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ concluded that Yackley was

not disabled under the Act. At Step One, the ALJ found that Yackley did not engage in

substantial gainful activity between his alleged onset date of August 28, 2012, and his date

4

last insured of December 31, 2012. (Tr. 18). At Step Two, the ALJ found that Yackley had several severe impairments: degenerative disc disease and stenosis of the lumbar spine, obesity, and osteoarthritis. (Tr. 18). The ALJ further determined, however, that none of these impairments met or medically equaled a listed impairment. (Tr. 20).

The ALJ then found that Yackley had the residual functional capacity to perform medium work "except: he can frequently climb, balance, stoop, kneel, crouch and crawl," (Tr. 20), which left him unable to perform his past relevant work in a composite position as "stock clerk grocery" and "cashier." (Tr. 22). Finally, at Step Five, the ALJ found that through the date last insured, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed"—namely, laundry worker, linen room attendant, or packager. (Tr. 23).

### E. Administrative Record

#### 1. Medical Evidence

The Court has thoroughly reviewed Yackley's medical record. In lieu of summarizing his medical history here, the Court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### a. Yackley's Function Report

Yackley completed his function report on July 22, 2014. He indicated that his alleged medical conditions sometimes affected his daily life. For example, he reported some difficulty sleeping, as he was "unable to get comfortable," and had to "get up and sit in [a] lounge chair for a while—then back to bed." He had "trouble with socks and shoes"

and had to use the shower instead of the tub for bathing, but otherwise indicated no problems with personal care. (Tr. 172).

He also marked that he had trouble with lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs. (Tr. 176). He could lift 10 to 20 pounds and walk "a very short distance," "100 yards" or "maybe shorter" before needing to take a 15-minute rest. (Tr. 176).

Some aspects of his daily life remained unchanged from before his reported onset: He continued to prepare his own meals daily, (Tr. 173), and was comfortable paying bills, counting change, handling a savings account, and using a checkbook. (Tr. 174-75). He could still drive and could go out unaccompanied; he regularly went alone to church, the doctor, and the dentist. (Tr. 175). He went grocery shopping with his mother once a month for about an hour, where he needed to hold on to the shopping cart. (Tr. 174). He had no problem getting along with family, friends, neighbors, or others. (Tr. 176).

For hobbies, he liked to read and watch sports on TV. Since the onset of his conditions, however, he had been unable to "bowl or play any kind of sports." (Tr. 176). He played cards instead, mostly with his elderly parents. (Tr. 175).

### b. Yackley's Testimony at the Administrative Hearing

At the hearing, Yackley's chief complaints were of pain in his back and knee. He felt a "pretty sharp" pain in the last three vertebrae in his spine and his tailbone, with "two or three" days a week being particularly bad. Further, after Yackley underwent surgery on his left knee to repair a torn meniscus, that knee became "loaded with arthritis." (Tr. 42).

His prescribed muscle relaxant also sometimes made him "a little drowsy or tired." (Tr. 49).

Yackley confirmed he had not done any work for pay or profit since his amended onset date of August 28, 2012—in fact, he had last been employed in 2007. (Tr. 38, 47). He had a bachelor of science and had spent several more years pursuing a Master's in "business, finance, banking." (Tr. 35). When he was still working, he had "basically the same position" for years as a cashier and stocker in several grocery stores, where he "did stock, put stock on the shelf at night, unloaded trucks, ran the register at night . . . [and] did basic customer service work." The job required him to lift as much as 80 pounds and be on his feet "almost all" day. (Tr. 37).

Asked why he could no longer work a full-time job on a sustained basis, Yackley answered, "For one thing, nobody will hire me. The second thing is I can't lift very much for very long periods of time." (Tr. 39). He said he could stand for 15 minutes before needing to sit, and then sit for 15 minutes before needing to stand. (Tr. 39-40). He estimated he could lift about ten pounds, and could not bend to pick something up off the floor without pain. (Tr. 40).

At the time of his testimony, Yackley was divorced and living with his elderly parents. (Tr. 33). He would "try to do what I can to help them out." (Tr. 33-34). For example, he helped with household chores by taking out the garbage—though he was unable to cut the lawn or shovel snow. "On occasion" he also cooked "easy stuff" like hamburgers, (Tr. 45), and he was able to go grocery shopping using an electric cart or by taking a break partway through to sit down. (Tr. 47).

While he used to bowl and play basketball, baseball, and football, he was no longer able to do so; instead, he played cards. (Tr. 46).

By way of treatment, Yackley took atenolol and losartan potassium regularly, as well as Flexeril, aspirin, Extra Strength Tylenol, and Motrin when needed. (Tr. 42-43). He also used Biofeed rub, a skin rub that provides heat for pain relief. (Tr. 43). Once in a while he used a cane. (Tr. 44). He did "not generally" need to lie down during the day, but spent six to seven hours a day reclining in a La-Z-Boy chair at home, as sitting in a chair with a high back helped relieve his pain. (Tr. 44-45).

Finally, Yackley's attorney clarified that "the limitations you talk about today, they were in effect as of 2012, is that correct?" (Tr. 47-78). Yackley confirmed they were. (*Id.*).

### c. The VE's Testimony at the Administrative Hearing

As an initial matter, the VE classified Yackley's past employment as semi-skilled, (Tr. 54), and a composite of "store clerk grocery"—rated as heavy duty, in this instance "somewhere between medium and heavy"—and "cashier grocery"—a light duty job. (Tr. 50-51).

The ALJ then asked her first hypothetical: "Assume that this individual is limited to working at the medium exertional level and the person would be limited to frequent rather than constant climbing, balancing, stooping, kneeling, crouching or crawling. Could the hypothetical individual perform . . . the claimant's past work . . . ?" (Tr. 51). The VE said no. The ALJ then inquired whether the same hypothetical individual could perform other medium work, to which the VE responded yes, as a "laundry worker I" (with 28,000 jobs

nationally), "linen room attendant" (57,000 jobs nationally), or "packager" (132,000 jobs nationally). (Tr. 51-52).

Moving on to her second hypothetical, the ALJ asked, "So now assume that the person is limited to working at the light exertional level and can only occasionally climb, balance, stoop, kneel, crouch or crawl. Are there jobs in the national economy that the person would be able to perform?" (Tr. 52). In that case, the VE answered, the person could work at the light-duty level as a "fast food worker" (750,000 jobs nationally), "marker" (144,000 jobs nationally), or "parking lot attendant" (41,000 jobs nationally). (*Id.*).

Next, the ALJ added another restriction to the hypothetical: "a sit/stand option . . . so that the person would have the ability to change position between sitting or standing at will provided that they wouldn't be off task more than ten percent of the workday and making those positional changes. Would those jobs that you just gave me at the light level be available?" (Tr. 52-53).

The jobs of parking lot attendant and marker would still be available, said the VE, although the number of available jobs would be reduced to 35,000 and 56,000 nationally, respectively. (Tr. 53). Fast food worker would no longer be available, but the VE offered in its place "mail room clerk" (99,000 jobs nationally). (*Id.*).

The ALJ posed a final hypothetical in which the person was "limited to a total of only two hours sitting and two hours of standing or walking within an eight-hour workday." (*Id.*). These would be work-preclusive limitations, the VE responded. (*Id.*).

Finally, the VE addressed a hypothetical from Yackley's attorney in which a person "would have two or three bad days to the point that he couldn't even show up for work."

(Tr. 56). "That would be work preclusive in my opinion," the VE said. "Anything more than one day per month missed is work preclusive." (*Id.*).

## F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at

whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to any subsequent reviewers the weight
> the adjudicator gave to the treating source's opinion and the reasons for that
> weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at

242. For example, an ALJ may properly reject a treating source opinion if it lacks

supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F.

Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930,

at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the record

and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.

*See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.

Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186,

at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that

objective medical evidence of the underlying condition exists. The ALJ then determines

whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

A claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "[O]bjective evidence of the pain itself" is not required. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore,

the claimant's work history and the consistency of his subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Yackley argues that the ALJ erred because (1) she failed to properly weigh the RFC assessment completed by Yackley's treating physician and (2) substantial evidence does not support the ALJ's finding that Yackley was capable of a limited range of medium work during the period between his alleged onset date and his insurance cutoff date.

### 1. The ALJ provided good reasons for according limited weight to the RFC assessment completed by Yackley's treating physician.

Yackley argues that the ALJ failed to give proper weight to the RFC assessment completed by his treating physician, Dr. Giordano. (Doc. 14 at 13). Dr. Giordano completed the assessment at his request in March 2014, (Tr. 422)—more than a year after

Yackley's insurance had lapsed. (Tr. 325). She indicated that she had seen Yackley since 2008 for "preventative care" and follow-up for "ongoing chronic conditions," namely, hypertension, hyponatremia, obesity, hyperlipidemia, "low back pain," and "knee pain." (Tr. 419). As for treatment, she wrote that Yackley was doing "home exercises for strengthening/stabilization" and "working on weight loss." (*Id.*). According to her assessment, Yackley would be incapable of even "low stress" jobs due to his back. (Tr. 420). He could walk 30 yards without rest or severe pain, sit for 45 minutes, and stand for 30 minutes; he could sit or stand or walk less than 2 hours total in an 8-hour workday. (Tr. 420-21) He could frequently lift less than 10 pounds, occasionally lift up to 20 pounds, and never lift 50 pounds. (Tr. 420). Additionally, he could never twist, crouch, or climb ladders, and could only rarely stoop or bend, although he could occasionally climb stairs. (Tr. 422) He would need "frequent breaks" from doing repetitive reaching, handling, or fingering, and "lifting [his arms] up or down would not be well." (*Id.*). Dr. Giordano asserted that Yackley had been so limited since July 29, 2008—the date of his first appointment with her.

The ALJ assigned only limited weight to Dr. Giordano's assessment, explaining, "Relative to the period through December 2012, I do not find Dr. Giordano's appraisal to be well supported objectively, or to be consistent with the record as a whole, or to accurately reflect the claimant's functionality." (Tr. 22).

In Yackley's brief, he asserts that the "ALJ's statement that Dr. Giordano's functional assessment and appraisal were not well supported objectively does not suffice to satisfy the explanatory requirement of the treating source rule." (Doc. 14 at 17). He

argues that the Sixth Circuit has held that "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies." (Doc. 14 at 17-18) (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010). Further, Yackley asserts that a finding that a treating source medical opinion is inconsistent with other substantial evidence in the record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. (Doc. 14 at 18) (citing *Fisk v. Astrue*, 253 F.App'x 580, 585 (6th Cir. 2007)).

As an initial matter, it is misleading to suggest that the ALJ rejected Dr. Giordano's opinion outright. Rather, the ALJ stated plainly, "I assign limited weight to Dr. Giordano's opinion." (Tr. 22).

Nor is that the sum total of the ALJ's discussion on this point. Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, the source's treatment relationship with the client, the supportability of the source's opinion, the consistency of the opinion with the record as a whole, and whether the source is a specialist opining on areas within her specialty, as well as "any factors [the claimant] or others bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion." 20 C.F.R. § 416.927(c)(1)-(6). The ALJ is not required to provide an "exhaustive factor-by-factor analysis," *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011), but "will always give good reasons . . . for the weight" given a "treating source's opinion." 20 C.F.R. § 416.927(c)(2). The regulations direct the ALJ to give controlling weight to certain opinions of a treating physician if they are "well-supported by medically acceptable clinical

and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

Unfortunately for Yackley, a perusal of the ALJ's opinion and the record provides good reason for her decision to assign only limited weight to Dr. Giordano's opinion. The ALJ notes that "looking only at the period leading up to the date last insured, the degree of limitation suggested by Dr. Giordano is not borne out by the record. The clinician's own progress notes, discussed above, cite modest findings." (Tr. 22). An inconsistency between a treating physician's opinion and the physician's own treatment records or the medical records as a whole can be "a 'good reason' to discount treating physician opinion evidence." *Hudson v. Colvin*, No. 15-163-ART, 2015 WL 12684338, at *2 (E.D. Ky. Dec. 23, 2015); *see also Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (affirming an ALJ's decision to discount the opinion of a treating physician that was inconsistent with the physician's treatment records).

With that, the ALJ directs the reader to a detailed discussion of Dr. Giordano's notes conducted earlier in the opinion, which shows particular attention to the two appointments Yackley had between his alleged onset date and the date when his insurance lapsed. There, the ALJ notes that on Yackley's alleged onset date of August 28, 2012, he reported to Dr. Giordano "instances of knee pain, and back pain that occurred when he was more active doing outside duties." (Tr. 19). He also remarked, however, that "he felt pretty good." (*Id.*). The ALJ goes on to describe Dr. Giordano's own recorded observations that Yackley appeared

well nourished, well developed, and in no distress. The claimant's blood pressure was 136/80, and his heart sounds and rhythm were normal. His lungs were clear to auscultation, and without adventitious sounds, intercostal retractions or accessory muscle use. The claimant's abdomen was obese and negative for tenderness, distention, ascites, organomegaly or masses. The claimant's extremities were not clubbed, cyanotic or edematous. No limitation of motion, neurovascular deficit or gait irregularity was noted. The claimant displayed no unusual anxiety or evidence of depression . . . .

(Tr. 19) (internal citations omitted).

Next, I note that the Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). Here, the record lends further credence to the ALJ's finding, as, far from prescribing any limitations on Yackley's daily activities or movements, Dr. Giordano in fact instructed Yackley to "exercise, and to get out and be active." (*Id.*). Over the course of their relationship, Dr. Giordano and her cohorts in the office repeatedly told Yackley to go for walks or otherwise exercise—after their first appointment, after his alleged onset date, after his insured status expired, and so on, well into 2014. (Tr. 211, 214, 216, 218, 220, 222, 225, 227, 231, 234, 236, 260, 266, 269, 272, 276, 285, 305, 309, 317, 334, 342). For example, on Yackley's alleged onset date, Dr. Giordano instructed him to "get out moving/exercising" and to "[m]ove your joints!"—hardly the advice a doctor would be expected to give a patient who cannot walk farther than 30 yards. (Tr. 280).

In October 2012, at Yackley's only other appointment before his insurance lapsed, Dr. Giordano reiterated that "[p]atient's goal is to get out and exercise" and discussed a "walking program" with him. (Tr. 285-86). Yackley told her that "[i]n nice weather he will

walk around his trailer park." (Tr. 286). He reported no back or knee pain whatsoever. (Tr. 285). Indeed, he did not report back pain again for nearly a year after his onset date—months after his insured status had expired. (Tr. 305). The absence of even a single notation about back pain in that time stands in stark contrast to Dr. Giordano's assertion that Yackley was incapable of working even low-stress jobs due to his back, and that he had been so limited since July 2008.

Even Dr. Giordano's own notes from her July 2008 appointment with Yackley call that assessment into question. At the time, she wrote Yackley was "feeling good" and played softball and basketball for fun; she encouraged him to exercise for 30 minutes every day. (Tr. 211). She marked he was "negative for back pain." (Tr. 212).

Additionally, the ALJ notes that Dr. Giordano's assessment essentially mirrors Yackley's self-reported limitations: "At the time of the request, the claimant informed [Dr. Giordano] that he believed he was disabled and could not stand more than 25-30 minutes, that he could not sit more than 45-50 minutes, etc." (Tr. 22) (internal citation omitted). Then "Dr. Giordano indicated that the claimant was unable to stand more than 30 minutes, and was unable to sit more than 45 minutes." (*Id.*) (internal citations omitted). An ALJ may properly reject a treating source's opinion where it "relies on [the claimant's] subjective claims rather than on detailed clinical data." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2011); *see also Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990) (ALJ properly discounted psychiatrist's opinion that was made "almost entirely on the basis of the claimant's subjective complaints.").

Thus, the ALJ provided good reasons to afford only limited weight to Dr. Giordano's RFC assessment.

### 2. Substantial evidence supports the ALJ's finding that plaintiff was capable of a limited range of medium work during the period between his onset date and the insurance cutoff date.

Second, Yackley argues that the ALJ lacked substantial evidence for her finding that Yackley could perform medium work with some limitations during the relevant period. "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c). Medium work also requires "frequent stooping and crouching." SSR 83-14. Here, the ALJ found that "through the date last insured, the claimant had the residual functional capacity to perform medium work . . . except: he can frequently climb, balance, stoop, kneel, crouch and crawl." (Tr. 20).

It is true that the ALJ "found the claimant to be a candid and forthcoming individual," and emphasized that "he certainly appears to have significant limitation and dysfunction at the present day." (Tr. 22). But Yackley's limitations in the present day are not at issue. Yackley carried the burden of proving he was disabled between his alleged date of onset in August 2012 and the expiration of his insured status in December 2012. He presented only "a modest amount of evidence affiliated with his alleged health concerns" during that time, (Tr. 22). As the ALJ noted, "[t]he record does not fully support that claimant's contentions as to the magnitude of his symptomology and dysfunction, including his expressed level of pain, and reported need to take breaks and to recline for extended intervals on most days, as of the date last insured." (Tr. 21). For example, as

discussed in Section 1, *supra*, Yackley's treating physician repeatedly recommended he walk or otherwise exercise, from his first appointment with her in 2008 through at least mid-2014. The ALJ remarked further that "[d]uring the relevant period, the claimant did not undergo surgical intervention, physical therapy, injection modalities, work hardening or other aggressive rehabilitation measures." (Tr. 21). [1]

An ALJ may consider the credibility of the claimant when making a disability determination, and a reviewing court must give great weight to that credibility determination. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). Inconsistencies within the claimant's testimony or between his testimony and the medical record may constitute substantial evidence sufficient to support the ALJ's decision to treat the claimant's testimony "as less than credible." *Id.* at 543; *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

Additionally, the ALJ assigned "some weight" to findings made by non-examining Disability Determination Service physician Quan Nguyen. (Tr. 22). At the initial determination level, the DDS found insufficient evidence to establish Yackley had a "severe" impairment during the relevant time. While the ALJ explained that evidence

---

[1] Although I briefly address the ALJ's determination of Yackley's credibility, I note that Yackley never explicitly challenged that determination. Thus, to the extent that his brief relies on the credibility of his own testimony, it does him little service. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. 'It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995) (citation omitted).

supplied after the DDS's determination "persuade[d] me the claimant had a 'severe' impairment," she still "concur[red] with the ultimate DDS determination that the claimant was not disabled under the Social Security Act through December 2012." (Tr. 22). *Dotson v. Apfel*, No. 99-6163, 2000 WL 1562817, at *2 (6th Cir. Oct. 10, 2000) (holding that "when considered in the context of the complete record, a non-treating physician's medical opinion can constitute substantial evidence"); *see, e.g.*, *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989).

The ALJ also pointed out that "[w]ithin testimony or the written record, it was reported that the claimant performed self-care tasks, prepared simple meals, helped his elderly parents with household chores, took out trash, mowed the lawn, drove an automobile, shopped (sometimes with an electric cart), played cards, read, watched television sports, paid bills, and attend[ed] church services." (Tr. 21) (internal citation omitted). Yackley challenges only this—the ALJ's consideration of his daily activities. (Doc. 14 at 18-23). He argues that "[s]poradic and transitory activities such as hobbies, household chores, social activities, religious activities and driving an automobile should not be considered as showing an ability to engage in substantial gainful activities." (Doc. 14 at 13). But it is entirely appropriate for the ALJ to consider the claimant's daily activities, among other factors, when determining his work function—indeed, the regulations direct the ALJ to do so. 20 C.F.R. § 404.1529(c)(3). For example, in *Blacha*, the Sixth Circuit found that the ALJ had "an adequate basis to discount [the claimant's] credibility" in part because "some of [his] activities were inconsistent with his claims of disabling pain." *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir.

1990). "Especially significant," the court found, was the claimant's ability to drive. *Id.*; *see also Morr v. Comm'r of Soc. Sec.*, 66 F. App'x 210, 212 (6th Cir. 2015) (finding ALJ's adverse credibility determination was properly based in part on contradictions between the claimant's alleged medical complaints and her "own activities including providing for her own personal grooming, cleaning, cooking daily for up to an hour, watching television, washing dishes three time[s] daily, doing laundry, caring for cats, and driving"); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (finding that the ALJ properly "considered [the claimant's] testimony concerning fatigue and shortness of breath in light of other evidence that [she] regularly walks around her yard for exercise, rides an exercise bicycle, goes to church, goes on vacation, cooks, vacuums, and makes beds"); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) (finding that the ALJ acted properly when he took into account that claimant could "run all of his errands, walk two miles, prepare all of his meals, and drive three times a week").

Lastly, Yackley asserts that "[t]he Seventh Circuit has cautioned the SSA against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." (Doc. 14 at 15 (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006))). But it is not for this Court to reweigh the evidence. *See Mullins v. Sec'y of Health and Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the [Commissioner]."). Our sole duty is to determine whether the ALJ "has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014). If substantial evidence supports the ALJ's determination, the reviewing

court must affirm it, "even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Plaintiff requests that the Court reverse the final decision of the Commissioner and grant disability benefits to Yackley. The Court may do so, however, only if it determines first that substantial evidence does not support the decision, and then that all essential factual issues have been resolved and the record adequately establishes the plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994). Here, as the Commissioner's findings are supported by substantial evidence, a judicial award of benefits is unjustified.

### H. Conclusion

For the reasons stated above, the Court finds that the ALJ's decision, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

## II. ORDER

In light of the above findings, **IT IS ORDERED** that Yackley's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 17), be **GRANTED**, and this case be **AFFIRMED**.

Date: August 31, 2017

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 31, 2017                         By s/Kristen Castaneda
                                                              Case Manager